# Exhibit A

 **United States Patent and Trademark Office**

Home|Site Index|Search|Guides|Contacts|eBusiness|eBiz alerts|News|Help



**TTABVUE. Trademark Trial and Appeal Board Inquiry System**　　　　　**v2.4.0**

# Opposition

| | | | |
|---|---|---|---|
| **Number:** 91170112 | | **Filing Date:** 03/20/2006 | |
| **Status:** Terminated | | **Status Date:** 09/05/2012 | |
| **General Contact Number:** 571-272-8500 | | | |
| **Interlocutory Attorney:** ELIZABETH A DUNN | | | |
| **Paralegal Name:** LALITA R WEBB | | | |

**Defendant**

**Name:** Triumph Learning LLC

**Correspondence:** ROBERT M. O'CONNELL, JR.
GOODWIN PROCTER LLP
53 STATE STREET, ATTN: TRADEMARK ADMINISTRATOR EXCHANGE PLACE
BOSTON, MA 02109-2881
UNITED STATES
rhosp@goodwinprocter.com

| | | | |
|---|---|---|---|
| **Serial #:** 78535642 | Application File | Assignment | **Registration #:** 4219846 |
| **Application Status:** REGISTERED AND RENEWED | | | |
| **Mark:** COACH | | | |

| | | | |
|---|---|---|---|
| **Serial #:** 78536143 | Application File | Assignment | **Registration #:** 4219848 |
| **Application Status:** CANCELLED - SECTION 8 | | | |
| **Mark:** COACH AMERICA'S BEST FOR STUDENT SUCCESS | | | |

| | | | |
|---|---|---|---|
| **Serial #:** 78536065 | Application File | Assignment | **Registration #:** 4219847 |
| **Application Status:** CANCELLED - SECTION 8 | | | |
| **Mark:** COACH | | | |

**Plaintiff**

**Name:** Coach Services, Inc.

**Correspondence:** NORMAN H. ZIVIN
COOPER & DUNHAM LLP
30 Rockefeller Plaza
NEW YORK, NY 10112
UNITED STATES
nzivin@cooperdunham.com

**Granted To Date:** 03/19/2006

## Prosecution History

| # | Date | History Text | Due Date |
|---|---|---|---|
| 235 | 09/05/2012 | TERMINATED | |
| 234 | 06/18/2012 | BOARD'S DECISION: DISMISSED | |
| 233 | 04/13/2012 | CT'S DECISION AFFIRMED IN PART, VACATED IN PART, REMANDED - MANDATE | |
| 232 | 02/21/2012 | CT'S DECISION AFFIRMED IN PART, VACATED IN PART, REMANDED | |
| 231 | 11/16/2010 | APPEAL TO CAFC | |
| 230 | 11/16/2010 | CERTIFICATE OF MAILING | |
| 229 | 09/17/2010 | BOARD'S DECISION: DISMISSED | |
| 228 | 02/17/2010 | ORAL HEARING APPEARANCE RECORD | |
| 227 | 01/14/2010 | D'S NOTICE OF BANKRUPTCY/COURT'S ORDER GRANTING D'S MOTION TO WAIVE AUTOMATIC STAY TO PERMIT PROCEED | |
| 226 | 01/14/2010 | ORAL HEARING SCHEDULED | |
| 225 | 07/30/2009 | P'S REBUTTAL BRIEF | |
| 224 | 07/14/2009 | Confidential Brief on Merits for Defendant | |
| 223 | 07/06/2009 | D'S REQUEST FOR ORAL HEARING | |
| 222 | 07/06/2009 | FINAL BRIEF ON MERITS FOR DEFENDANT(S) | |
| 221 | 07/06/2009 | Confidential Brief on Merits for Defendant | |
| 220 | 06/22/2009 | PL'S EXHIBITS | |

**Prosecution History**

| # | Date | History Text | Due Date |
|---|------|--------------|----------|
| 219 | 06/22/2009 | PL'S NOTICE OF RE-FILING TESTIMONY | |
| 218 | 06/05/2009 | P'S REQUEST FOR ORAL HEARING | |
| 217 | 06/05/2009 | BRIEF ON MERITS FOR PLAINTIFF | |
| 216 | 06/04/2009 | TESTIMONY FOR DEFENDANT | |
| 215 | 06/04/2009 | Confidential Testimony For Defendant | |
| 214 | 06/04/2009 | Confidential Testimony For Defendant | |
| 213 | 06/04/2009 | Confidential Testimony For Defendant | |
| 212 | 06/04/2009 | Confidential Testimony For Defendant | |
| 211 | 06/04/2009 | Confidential Testimony For Defendant | |
| 210 | 06/04/2009 | TESTIMONY FOR DEFENDANT | |
| 209 | 06/04/2009 | TESTIMONY FOR DEFENDANT | |
| 208 | 06/04/2009 | TESTIMONY FOR DEFENDANT | |
| 207 | 06/04/2009 | TESTIMONY FOR DEFENDANT | |
| 206 | 06/04/2009 | TESTIMONY FOR DEFENDANT | |
| 205 | 06/04/2009 | TESTIMONY FOR DEFENDANT | |
| 204 | 06/04/2009 | TESTIMONY FOR DEFENDANT | |
| 203 | 06/04/2009 | TESTIMONY FOR DEFENDANT | |
| 202 | 06/04/2009 | TESTIMONY FOR DEFENDANT | |
| 201 | 06/04/2009 | TESTIMONY FOR DEFENDANT | |
| 200 | 06/03/2009 | TESTIMONY FOR DEFENDANT | |
| 199 | 06/03/2009 | TESTIMONY FOR DEFENDANT | |
| 198 | 06/04/2009 | TESTIMONY FOR DEFENDANT | |
| 197 | 06/04/2009 | TESTIMONY FOR DEFENDANT | |
| 196 | 06/04/2009 | TESTIMONY FOR DEFENDANT | |
| 195 | 06/04/2009 | TESTIMONY FOR DEFENDANT | |
| 194 | 06/04/2009 | TESTIMONY FOR DEFENDANT | |
| 193 | 06/04/2009 | TESTIMONY FOR DEFENDANT | |
| 192 | 06/04/2009 | TESTIMONY FOR DEFENDANT | |
| 191 | 06/04/2009 | TESTIMONY FOR DEFENDANT | |
| 190 | 06/04/2009 | TESTIMONY FOR DEFENDANT | |
| 189 | 06/04/2009 | TESTIMONY FOR DEFENDANT | |
| 188 | 06/04/2009 | TESTIMONY FOR DEFENDANT | |
| 187 | 06/04/2009 | TESTIMONY FOR DEFENDANT | |
| 186 | 06/04/2009 | TESTIMONY FOR DEFENDANT | |
| 185 | 06/04/2009 | TESTIMONY FOR DEFENDANT | |
| 184 | 06/04/2009 | TESTIMONY FOR DEFENDANT | |
| 183 | 06/04/2009 | TESTIMONY FOR DEFENDANT | |
| 182 | 06/04/2009 | TESTIMONY FOR DEFENDANT | |
| 181 | 06/04/2009 | TESTIMONY FOR DEFENDANT | |
| 180 | 06/04/2009 | TESTIMONY FOR DEFENDANT | |
| 179 | 06/04/2009 | TESTIMONY FOR DEFENDANT | |
| 178 | 06/04/2009 | TESTIMONY FOR DEFENDANT | |
| 177 | 06/04/2009 | TESTIMONY FOR DEFENDANT | |
| 176 | 06/04/2009 | TESTIMONY FOR DEFENDANT | |
| 175 | 06/04/2009 | TESTIMONY FOR DEFENDANT | |
| 174 | 06/04/2009 | TESTIMONY FOR DEFENDANT | |
| 173 | 06/04/2009 | TESTIMONY FOR DEFENDANT | |
| 172 | 06/04/2009 | TESTIMONY FOR DEFENDANT | |
| 171 | 06/04/2009 | TESTIMONY FOR DEFENDANT | |
| 170 | 06/04/2009 | TESTIMONY FOR DEFENDANT | |
| 169 | 06/04/2009 | TESTIMONY FOR DEFENDANT | |
| 168 | 06/04/2009 | TESTIMONY FOR DEFENDANT | |
| 167 | 06/04/2009 | TESTIMONY FOR DEFENDANT | |
| 166 | 06/04/2009 | TESTIMONY FOR DEFENDANT | |
| 165 | 06/04/2009 | TESTIMONY FOR DEFENDANT | |
| 164 | 06/04/2009 | TESTIMONY FOR DEFENDANT | |
| 163 | 06/04/2009 | TESTIMONY FOR DEFENDANT | |
| 162 | 06/04/2009 | TESTIMONY FOR DEFENDANT | |
| 161 | 06/04/2009 | TESTIMONY FOR DEFENDANT | |

**Prosecution History**

| # | Date | History Text | Due Date |
|---|------|--------------|----------|
| 160 | 06/04/2009 | TESTIMONY FOR DEFENDANT | |
| 159 | 06/04/2009 | TESTIMONY FOR DEFENDANT | |
| 158 | 06/04/2009 | TESTIMONY FOR DEFENDANT | |
| 157 | 06/04/2009 | TESTIMONY FOR DEFENDANT | |
| 156 | 06/04/2009 | TESTIMONY FOR DEFENDANT | |
| 155 | 06/04/2009 | TESTIMONY FOR DEFENDANT | |
| 154 | 06/04/2009 | TESTIMONY FOR DEFENDANT | |
| 153 | 06/04/2009 | TESTIMONY FOR DEFENDANT | |
| 152 | 06/04/2009 | TESTIMONY FOR DEFENDANT | |
| 151 | 06/04/2009 | TESTIMONY FOR DEFENDANT | |
| 150 | 06/04/2009 | TESTIMONY FOR DEFENDANT | |
| 149 | 06/04/2009 | TESTIMONY FOR DEFENDANT | |
| 148 | 06/03/2009 | TESTIMONY FOR DEFENDANT | |
| 147 | 06/04/2009 | TESTIMONY FOR DEFENDANT | |
| 146 | 06/04/2009 | TESTIMONY FOR DEFENDANT | |
| 145 | 06/04/2009 | TESTIMONY FOR DEFENDANT | |
| 144 | 06/03/2009 | TESTIMONY FOR DEFENDANT | |
| 143 | 06/04/2009 | TESTIMONY FOR DEFENDANT | |
| 142 | 06/03/2009 | TESTIMONY FOR DEFENDANT | |
| 141 | 06/04/2009 | TESTIMONY FOR DEFENDANT | |
| 140 | 06/03/2009 | TESTIMONY FOR DEFENDANT | |
| 139 | 06/03/2009 | TESTIMONY FOR DEFENDANT | |
| 138 | 06/03/2009 | TESTIMONY FOR DEFENDANT | |
| 137 | 06/03/2009 | TESTIMONY FOR DEFENDANT | |
| 136 | 06/03/2009 | TESTIMONY FOR DEFENDANT | |
| 135 | 06/03/2009 | TESTIMONY FOR DEFENDANT | |
| 134 | 06/03/2009 | TESTIMONY FOR DEFENDANT | |
| 133 | 06/03/2009 | TESTIMONY FOR DEFENDANT | |
| 132 | 06/03/2009 | TESTIMONY FOR DEFENDANT | |
| 131 | 06/03/2009 | TESTIMONY FOR DEFENDANT | |
| 130 | 06/03/2009 | TESTIMONY FOR DEFENDANT | |
| 129 | 06/03/2009 | TESTIMONY FOR DEFENDANT | |
| 128 | 06/03/2009 | TESTIMONY FOR DEFENDANT | |
| 127 | 06/03/2009 | TESTIMONY FOR DEFENDANT | |
| 126 | 06/03/2009 | TESTIMONY FOR DEFENDANT | |
| 125 | 06/03/2009 | TESTIMONY FOR DEFENDANT | |
| 124 | 06/03/2009 | TESTIMONY FOR DEFENDANT | |
| 123 | 06/03/2009 | TESTIMONY FOR DEFENDANT | |
| 122 | 06/03/2009 | TESTIMONY FOR DEFENDANT | |
| 121 | 06/03/2009 | TESTIMONY FOR DEFENDANT | |
| 120 | 06/03/2009 | TESTIMONY FOR DEFENDANT | |
| 119 | 06/03/2009 | TESTIMONY FOR DEFENDANT | |
| 118 | 06/03/2009 | TESTIMONY FOR DEFENDANT | |
| 117 | 06/03/2009 | TESTIMONY FOR DEFENDANT | |
| 116 | 06/03/2009 | TESTIMONY FOR DEFENDANT | |
| 115 | 06/03/2009 | TESTIMONY FOR DEFENDANT | |
| 114 | 06/03/2009 | TESTIMONY FOR DEFENDANT | |
| 113 | 06/03/2009 | TESTIMONY FOR DEFENDANT | |
| 112 | 06/03/2009 | TESTIMONY FOR DEFENDANT | |
| 111 | 06/03/2009 | TESTIMONY FOR DEFENDANT | |
| 110 | 06/03/2009 | TESTIMONY FOR DEFENDANT | |
| 109 | 06/03/2009 | TESTIMONY FOR DEFENDANT | |
| 108 | 06/03/2009 | TESTIMONY FOR DEFENDANT | |
| 107 | 06/03/2009 | TESTIMONY FOR DEFENDANT | |
| 106 | 06/03/2009 | TESTIMONY FOR DEFENDANT | |
| 105 | 06/03/2009 | TESTIMONY FOR DEFENDANT | |
| 104 | 06/03/2009 | TESTIMONY FOR DEFENDANT | |
| 103 | 06/03/2009 | TESTIMONY FOR DEFENDANT | |
| 102 | 06/03/2009 | TESTIMONY FOR DEFENDANT | |

**Prosecution History**

| # | Date | History Text | Due Date |
|---|------|--------------|----------|
| 101 | 06/03/2009 | TESTIMONY FOR DEFENDANT | |
| 100 | 06/03/2009 | TESTIMONY FOR DEFENDANT | |
| 99 | 06/03/2009 | TESTIMONY FOR DEFENDANT | |
| 98 | 06/03/2009 | TESTIMONY FOR DEFENDANT | |
| 97 | 06/03/2009 | TESTIMONY FOR DEFENDANT | |
| 96 | 06/03/2009 | TESTIMONY FOR DEFENDANT | |
| 95 | 06/03/2009 | TESTIMONY FOR DEFENDANT | |
| 94 | 06/03/2009 | TESTIMONY FOR DEFENDANT | |
| 93 | 06/03/2009 | TESTIMONY FOR DEFENDANT | |
| 92 | 06/03/2009 | TESTIMONY FOR DEFENDANT | |
| 91 | 06/03/2009 | TESTIMONY FOR DEFENDANT | |
| 90 | 06/03/2009 | TESTIMONY FOR DEFENDANT | |
| 89 | 06/03/2009 | TESTIMONY FOR DEFENDANT | |
| 88 | 06/03/2009 | TESTIMONY FOR DEFENDANT | |
| 87 | 06/03/2009 | TESTIMONY FOR DEFENDANT | |
| 86 | 06/03/2009 | TESTIMONY FOR DEFENDANT | |
| 85 | 06/03/2009 | TESTIMONY FOR DEFENDANT | |
| 84 | 06/03/2009 | TESTIMONY FOR DEFENDANT | |
| 83 | 06/03/2009 | TESTIMONY FOR DEFENDANT | |
| 82 | 06/03/2009 | TESTIMONY FOR DEFENDANT | |
| 81 | 06/03/2009 | TESTIMONY FOR DEFENDANT | |
| 80 | 06/03/2009 | TESTIMONY FOR DEFENDANT | |
| 79 | 06/03/2009 | TESTIMONY FOR DEFENDANT | |
| 78 | 06/03/2009 | TESTIMONY FOR DEFENDANT | |
| 77 | 06/03/2009 | TESTIMONY FOR DEFENDANT | |
| 76 | 06/03/2009 | TESTIMONY FOR DEFENDANT | |
| 75 | 06/03/2009 | TESTIMONY FOR DEFENDANT | |
| 74 | 06/03/2009 | TESTIMONY FOR DEFENDANT | |
| 73 | 06/03/2009 | TESTIMONY FOR DEFENDANT | |
| 72 | 06/03/2009 | TESTIMONY FOR DEFENDANT | |
| 71 | 06/03/2009 | TESTIMONY FOR DEFENDANT | |
| 70 | 06/03/2009 | TESTIMONY FOR DEFENDANT | |
| 69 | 06/03/2009 | TESTIMONY FOR DEFENDANT | |
| 68 | 06/03/2009 | TESTIMONY FOR DEFENDANT | |
| 67 | 06/03/2009 | TESTIMONY FOR DEFENDANT | |
| 66 | 06/03/2009 | TESTIMONY FOR DEFENDANT | |
| 65 | 06/03/2009 | TESTIMONY FOR DEFENDANT | |
| 64 | 06/03/2009 | TESTIMONY FOR DEFENDANT | |
| 63 | 06/03/2009 | TESTIMONY FOR DEFENDANT | |
| 62 | 06/03/2009 | TESTIMONY FOR DEFENDANT | |
| 61 | 06/03/2009 | TESTIMONY FOR DEFENDANT | |
| 60 | 06/03/2009 | TESTIMONY FOR DEFENDANT | |
| 59 | 06/03/2009 | TESTIMONY FOR DEFENDANT | |
| 58 | 06/03/2009 | TESTIMONY FOR DEFENDANT | |
| 57 | 06/03/2009 | TESTIMONY FOR DEFENDANT | |
| 56 | 06/03/2009 | TESTIMONY FOR DEFENDANT | |
| 55 | 06/03/2009 | TESTIMONY FOR DEFENDANT | |
| 54 | 06/03/2009 | TESTIMONY FOR DEFENDANT | |
| 53 | 06/03/2009 | TESTIMONY FOR DEFENDANT | |
| 52 | 06/03/2009 | TESTIMONY FOR DEFENDANT | |
| 51 | 06/03/2009 | TESTIMONY FOR DEFENDANT | |
| 50 | 06/03/2009 | DEFENDANT'S NOTICE OF TAKING TESTIMONY | |
| 49 | 06/03/2009 | TESTIMONY FOR DEFENDANT | |
| 48 | 06/03/2009 | TESTIMONY FOR DEFENDANT | |
| 47 | 06/03/2009 | DF'S NOTICE OF FILING TESTIMONY | |
| 46 | 04/02/2009 | PL'S NOTICE OF RELIANCE | |
| 45 | 02/20/2009 | DEFENDANT'S NOTICE OF RELIANCE | |
| 44 | 01/28/2009 | EXTENSION OF TIME GRANTED | |
| 43 | 01/16/2009 | STIPULATION FOR AN EXTENSION OF TIME | |

**Prosecution History**

| # | Date | History Text | Due Date |
|---|------|--------------|----------|
| 42 | 12/22/2008 | EXTENSION OF TIME GRANTED | |
| 41 | 12/10/2008 | CHANGE OF CORRESPONDENCE ADDRESS | |
| 40 | 11/20/2008 | PL'S ANSWER TO DF'S FIRST SET OF INTERROGATORIES | |
| 39 | 10/27/2008 | PL'S NOTICE RELIANCE | |
| 38 | 10/27/2008 | PL'S NOTICE OF RELIANCE PART 1 | |
| 37 | 10/23/2008 | PL'S NOTICE OF RELIANCE PART 9 | |
| 36 | 10/23/2008 | PL'S NOTICE OF RELIANCE PART 8 | |
| 35 | 10/23/2008 | PL'S NOTICE OF RELIANCE PART 7 | |
| 34 | 10/23/2008 | PL'S NOTICE OF RELIANCE PART 4 | |
| 33 | 10/23/2008 | PL'S NOTICE OF RELIANCE PART 3 | |
| 32 | 10/23/2008 | PL'S NOTICE OF RELIANCE PART 6 | |
| 31 | 10/23/2008 | PL'S NOTICE OF RELIANCE PART 2 | |
| 30 | 10/23/2008 | PL'S NOTICE OF RELIANCE PART 5 | |
| 29 | 10/23/2008 | PL'S NOTICE OF RELIANCE PART 1 | |
| 28 | 10/14/2008 | STIPULATION FOR AN EXTENSION OF TIME | |
| 27 | 05/30/2008 | TRIAL DATES RESET | |
| 26 | 08/02/2007 | PL'S DECLARATION OF DAVID MCAUGHAN IN OPPOSITION TO DF'S MOTION TO COMPEL | |
| 25 | 08/02/2007 | P'S OPPOSITION/RESPONSE TO MOTION | |
| 24 | 07/24/2007 | SUSPENDED | |
| 23 | 07/13/2007 | D'S MOTION TO COMPEL DISCOVERY | |
| 22 | 05/09/2007 | EXTENSION OF TIME GRANTED | |
| 21 | 05/09/2007 | STIPULATION FOR AN EXTENSION OF TIME | |
| 20 | 04/10/2007 | EXTENSION OF TIME GRANTED | |
| 19 | 04/10/2007 | STIPULATION FOR AN EXTENSION OF TIME | |
| 18 | 02/12/2007 | DELETE ENTRY | |
| 17 | 02/12/2007 | DELETE ENTRY | |
| 16 | 02/09/2007 | EXTENSION OF TIME GRANTED | |
| 15 | 02/09/2007 | STIPULATION FOR AN EXTENSION OF TIME | |
| 14 | 12/21/2006 | BD'S ORDER RE: INADVERTENTLY ISSUED REGS. | |
| 13 | 12/15/2006 | ANSWER | |
| 12 | 12/12/2006 | EXTENSION OF TIME GRANTED | |
| 11 | 12/12/2006 | STIPULATION FOR AN EXTENSION OF TIME | |
| 10 | 11/24/2006 | P'S COMMUNICATION | |
| 9 | 11/18/2006 | PL'S MOTION TO AMEND THE NOTICE OF OPPOSITION IS HEREBY GRANTED AS CONCEDED | |
| 8 | 10/18/2006 | STIPULATED PROTECTIVE ORDER | |
| 7 | 10/10/2006 | P'S MOTION TO AMEND PLEADING/AMENDED PLEADING | |
| 6 | 10/12/2006 | EXTENSION OF TIME GRANTED | |
| 5 | 10/12/2006 | STIPULATION FOR AN EXTENSION OF TIME | |
| 4 | 05/05/2006 | ANSWER | |
| 3 | 03/30/2006 | PENDING, INSTITUTED | |
| 2 | 03/30/2006 | NOTICE AND TRIAL DATES SENT; ANSWER DUE: | 05/09/2006 |
| 1 | 03/20/2006 | FILED AND FEE | |

Results as of 12/07/2023 01:37 PM      **Back to search results**      Search: [                    ]

> **THIS OPINION IS A PRECEDENT OF THE T.T.A.B.**

Hearing:                                    Mailed:
February 17, 2010                           September 17, 2010

## UNITED STATES PATENT AND TRADEMARK OFFICE

———

### Trademark Trial and Appeal Board

———

Coach Services, Inc.
v.
Triumph Learning LLC

———

Opposition No. 91170112
to Application Serial No. 78535642
filed on December 20, 2004

and to Application Serial No. 78536065
and Application Serial No. 78536143
filed on December 21, 2004

———

Norman H. Zivin of Cooper & Dunham LLP for Coach Services, Inc.

R. David Hosp and Robert M. O'Connell, Jr. of Goodwin Procter LLP for Triumph Learning LLC.

———

Before Holtzman, Walsh and Bergsman, Administrative Trademark Judges.

Opinion by Bergsman, Administrative Trademark Judge:

Triumph Learning LLC ("applicant") filed use-based applications for the mark COACH, in standard character form (Serial No. 78535642), Coach, shown below (Serial No. 78536065),



Opposition No. 91170112

and COACH and design, shown below (Serial No. 78536143),

(applicant's marks are hereinafter referred to as "COACH")



all for the following goods:

> Computer software for use in child and
> adult education, namely, software to
> assist teachers and students at all
> levels in mastering standards-based
> curricula and in preparing for
> standardized exams; prerecorded audio
> and video tapes in the field of child
> and adult education, featuring materials
> to assist teachers and students at all
> levels in mastering standards-based
> curricula and in preparing for
> standardized exams, in Class 9; and,
>
> Printed materials in the field of child
> and adult education, namely, textbooks,
> workbooks, teacher guides and manuals,
> posters and flashcards, all featuring
> materials to assist teachers and
> students at all levels in mastering
> standards-based curricula and in
> preparing for standardized exams, in
> Class 16.

(hereinafter "educational materials for preparing for

standardized tests").

Coach Services, Inc. ("opposer") opposed the

registration of applicant's marks on the ground of priority

of use and likelihood of confusion under Section 2(d) of the

Opposition No. 91170112

Trademark Act of 1946, 15 U.S.C. §1052(d), dilution under Section 43(c) of the Trademark Act of 1946, 15 U.S.C. § 1125(c), and that applicant's marks are merely descriptive under Section 2(e)(1) of the Trademark Act of 1946, 15 U.S.C. §1052(e)(1).

Applicant denied the salient allegations in the notice of opposition.

<u>Evidentiary Issues</u>

A.    <u>Opposer's objection to the testimony of Jane Fisher</u>.

Applicant proffered the testimony of Jane Fisher, applicant's Vice President of Marketing, to authenticate catalogs, brochures and other advertising materials distributed by applicant since at least as early as 1990. However, because Ms. Fisher only has worked for applicant since July 2003, opposer objected to Ms. Fisher's testimony regarding any matters other than the identification of business records prior to July 2003 on the ground that she lacks personal knowledge about applicant's business prior to that date. Opposer's objection is sustained to the extent that we will consider Ms. Fisher's testimony regarding matters prior to July 2003 only for purposes of authenticating documents kept by applicant in the ordinary course of business. *See* Fed. R. Evid. 803(6).

Opposition No. 91170112

B.  <u>Applicant's objection to opposer's notice of reliance</u>.

Opposer proffered seven of its annual reports (Exhibits 206-212) in its first notice of reliance pursuant to Trademark Rule 2.122(e) pertaining to printed publications and official records.  Applicant objected to the introduction of opposer's annual reports on the ground that annual reports may not be introduced through a notice of reliance, but must be introduced and authenticated by competent testimony.[1]

Trademark Rule 2.122(e) provides, so far as pertinent, that "[p]rinted publications, such as books and periodicals, available to the general public in libraries or of general circulation among member of the public or that segment of the public which is relevant under an issue in a proceeding … may be introduced in evidence by filing a notice of reliance on the material being offered."  In this regard, corporate annual reports are not considered to be printed publications available to the general public.[2]  *Midwest Plastic Fabricators v. Underwriters Laboratories,* 12 USPQ2d 1267, 1270 n.5 (TTAB 1989), *aff'd,* 906 F.2d 1568, 15 USPQ2d 1359 (Fed. Cir. 1990); *Jeanne-Marc, Inc. v. Cluett, Peabody & Co., Inc.,* 221 USPQ 58, 59 n.4 (TTAB 1984); *Andrea Radio*

---

[1] Applicant's brief, p. 27.
[2] Because the annual reports were not printed from the Internet, they may not be admitted into evidence pursuant to a notice of reliance.  *Safer Inc. v. OMS Investments Inc.,* 94 USPQ2d 1031, 1039 n.18 (TTAB  2010).

Opposition No. 91170112

*Corp. v. Premium Import Co., Inc.,* 191 USPQ 232, 234 (TTAB 1976).

To the extent opposer responded to applicant's objection, opposer noted that Carole Sadler, opposer's former Vice President, General Counsel, and Secretary, testified that opposer's revenues were published in its annual reports. However, Ms. Sadler did not authenticate the annual reports attached to opposer's notice of reliance.

In view of the foregoing, applicant's objection is sustained and we give opposer's annual reports no consideration.

We also note that as part of its first notice of reliance, opposer introduced numerous catalogs (Exhibits 1-42). Catalogs are not considered to be printed materials in general circulation within the meaning of Rule 2.122(e). *Hiraga v. Arena,* 90 USPQ2d 1102, 1104-1105 (TTAB 2009); *Boyds Collection Ltd. v. Herrington & Co.,* 65 USPQ2d 2017, 2020 (TTAB 2003). While our general practice is not to consider evidence that has not been properly made of record, because we want to decide this case on the merits and because applicant did not object to the catalogs, we exercise our discretion in this case to treat the catalogs as having been stipulated into the record for whatever probative value they may have. *See Autac Inc. v. Viking Industries, Inc.,* 199 USPQ 367, 369 n.2 (TTAB 1978).

Opposition No. 91170112

<u>The Record</u>

By rule, the record includes applicant's application file and the pleadings.  Trademark Rule 2.122(b), 37 CFR §2.122(b).  In addition, the parties introduced the following testimony and evidence:

A.  <u>Opposer's evidence</u>.

1.  Testimony deposition of Carole P. Sadler, the former Vice President, General Counsel, and Secretary of Coach, Inc., with attached exhibits.

2.  Opposer's first notice of reliance comprising the following items:

> a.  Opposer's catalogs (Exhibits 1-42);
>
> b.  Advertisements appearing in newspapers and magazines (Exhibits 43-205);
>
> c.  Books published by opposer (Exhibits 213-215);
>
> d.  A chapter in a marketing textbook featuring a case study on opposer (Exhibit 216);
>
> e.  Opposer's COACH registrations (Exhibits 217-234) printed from the electronic database of the U.S. Patent and Trademark Office showing the current status of and title to the registrations, including but not limited

Opposition No. 91170112

to the following registrations for the mark COACH in typed drawing form:[3]

1. Registration No. 0751493 for "leather goods, namely, utility kits, portfolios, key cases, comb cases, pass cases, money clips, billfolds, wallets, pocket secretaries, stud cases, jewel cases, and leather book covers," in International Class 14;

2. Registration No. 1071000 for "women's handbags and carry-on luggage," in International Class 18, and "men's and women's belts," in International Class 25; and

3. Registration No. 2088706 for, *inter alia,* "eyeglass cases, cellular phone cases, computer cases and computer accessory cases," in International Class

---

[3] Opposer's registrations have not been properly made of record. Copies of registrations printed from the electronic records of the U.S. Patent and Trademark Office may be made of record pursuant to Trademark Rule 2.122(d) in proceedings commenced on or after August 31, 2007. *See Research In Motion Limited v. NBOR Corporation,* 92 USPQ2d 1926, 1928 (TTAB 2009); *Miscellaneous Changes to Trademark Trial and Appeal Board Rules,* 72 Fed.Reg. 42,242 (Aug. 1, 2007). The notice of opposition in this proceeding was filed on March 20, 2006. However, applicant has not lodged an objection to the introduction of opposer's registrations and, in fact, noted the registrations as part of opposer's record in its brief. (Applicant's Brief, p. 1). In view thereof, we consider opposer's registrations to have been stipulated into the record.

Opposition No. 91170112

> 9, and "desk pads, desk file trays, memo boxes, pencil cups, business card holders, paperweights, planning diaries, daily business planners, checkbook covers," in International Class 16;

    f.   Discovery deposition of Jane Fisher (Exhibit 235), applicant's Vice President of Marketing, with attached exhibits; and

    g.   Applicant's responses to opposer's interrogatories; and

3.   Opposer's second notice of reliance on newspaper and magazine articles referencing opposer (Exhibits 237-446) pursuant to Trademark Rule 2.122(e).

4.   Opposer's third notice of reliance on excerpts from websites promoting the sale of books and software incorporating the word "coach" in the title (Exhibits 447-490) pursuant to Trademark Rule 2.122(e).[4]

B.   Applicant's evidence.

1.   Testimony deposition of Jane Fisher, with attached exhibits.

2.   Notice of reliance on the following items:

---

[4] *Safer Inc. v. OMS Investments Inc.,* 94 USPQ2d 1031, 1039 (TTAB 2010) (documents obtained from internet may be admitted into evidence in *inter partes* proceeding pursuant to notice of reliance in same manner as printed publications in general circulation, in accordance with Rule 2.122(e), provided the documents identify date of publication or date accessed and printed, as well as its source (*e.g.,* the URL)).

Opposition No. 91170112

    a.   Excerpts from the discovery deposition of Carole P. Sadler, with attached exhibits;

    b.   Opposer's responses to designated requests for admission;

    c.   Opposer's responses to designated interrogatories; and,

    d.   Twenty-five third-party registrations for marks that include the word "Coach."

<u>Standing</u>

Because opposer's registrations are of record, opposer has established its standing. *Cunningham v. Laser Golf Corp.*, 222 F.3d 943, 55 USPQ2d 1842, 1844 (Fed. Cir. 2000); *Lipton Industries, Inc. v. Ralston Purina Co.*, 670 F.2d 1024, 213 USPQ 185, 189 (CCPA 1982).

Applicant argues that opposer does not have standing to prosecute the opposition on the ground of descriptiveness because opposer does not assert the right or a potential need to use the word "Coach" descriptively. Specifically, applicant contends that "standing is specific to each individual claim asserted, and must be demonstrated for each."[5] Applicant relies on statements by the U.S. Supreme Court in the *Int'l Primate Protection League* case:

> Standing does not refer simply to a party's capacity to appear in court. Rather, standing is gauged by the specific common-law, statutory or

---

[5] Applicant's Brief, p. 12.

Opposition No. 91170112

> constitutional claims the party presents
> … '[t]ypically … the standing inquiry
> requires careful judicial examination of
> a complaint's allegations to ascertain
> whether the particular plaintiff is
> entitled to an adjudication *of the
> particular claims asserted*."

*Int'l Primate Protection League v. Tulane Ed. Fund,* 500 U.S. 72, 77 (1990) (emphasis in the original). Thus, applicant concludes that just because opposer has standing to prosecute the opposition on the ground of priority of use and likelihood of confusion and dilution, it does not necessarily have standing to prosecute the opposition on the ground that applicant's mark is merely descriptive.

The statutory basis for an opposition is Section 13(a) of the Trademark Act of 1946, 15 U.S.C. §1063(a), which provides that "[a]ny person who believes that he would be damaged by the registration of a mark upon the principal register … may … file an opposition in the Patent and Trademark Office, stating the grounds therefor." In applying *International Primate Protection League* to an opposition, the claim is applicant's right to register its mark.

A party has standing to oppose the registration of a mark if it has a real interest in the proceeding: in other words, whether the plaintiff has a direct and personal stake in the outcome of the proceeding (*i.e.,* preventing the registration of applicant's mark). This prevents litigation

Opposition No. 91170112

where there is no real controversy between the parties. *Lipton Industries, Inc. v. Ralston Purina Co.,* 670 F.2d 1024, 213 USPQ 185, 189 (CCPA 1982); *see also Ritchie v. Simpson,* 170 F.3d 1092, 50 USPQ2d 1023, 1025 (Fed. Cir. 1999). "The requirement of standing 'focuses on the party seeking to get his complaint before a federal court and not in the issues he wishes to have adjudicated.'" *Morrow v. Microsoft Corp.,* 499 F.3d 1332, 84 USPQ2d 1377, 1382 (Fed. Cir. 2007), *quoting Valley Forge Christian College v. Americans United for Separation of Church and State,* 454 U.S. 464, 484 (1982). Thus, "[o]nce standing is established, the opposer is entitled to rely on any of the grounds set forth in Section 2 of the Lanham Act which negate applicant's right to its subject registration." *Jewelers Vigilance v. Ullenberg Corp.,* 823 F.2d 490, 2 USPQ2d 2021, 2023 (Fed. Cir. 1987); *see also Young v. AGB Corp.,* 152 F.3d 1377, 47 USPQ2d 1752, 1755 (Fed. Cir. 1998); *Lipton Industries, Inc. v. Ralston Purina Co.,* 213 USPQ at 190.[6]

With respect to applicant's argument that opposer may have standing to raise the issue of likelihood of confusion

---

[6] Cases have also permitted oppositions based on statutory grounds other than those enumerated in Section 2. *See, e.g., Community of Roquefort v. Santo,* 443 F.2d 1196, 170 USPQ 205 (CCPA 1971) (applicant failed to use its mark in commerce in violation of Section 1 of the Trademark Act); *Universal Overall Co. v. Stonecutter Mills Corp.,* 379 F.2d 983, 154 USPQ 104 (CCPA 1967) (fraud).

Opposition No. 91170112

and dilution, but not descriptiveness, we note that standing and grounds may be related, but they are distinct inquiries. *Jewelers Vigilance v. Ullenberg Corp.,* 2 USPQ2d at 2024. This case is unusual because opposer is not only asserting likelihood of confusion and dilution, but also that applicant's mark is merely descriptive without asserting that opposer has the right to use the mark descriptively. Nevertheless, there is no question that opposer has established a real interest in preventing the registration of applicant's mark and, therefore, pursuant to *Jewelers Vigilance, Young v. AGB,* and *Lipton,* opposer may object to the registration of applicant's mark as being merely descriptive even if opposer does not claim the right to use the mark descriptively.

<u>Priority</u>

Because opposer's pleaded registrations are of record, Section 2(d) priority is not an issue in this case as to the mark and the products covered by the registrations. *King Candy Co. v. Eunice King's Kitchen, Inc.,* 496 F.2d 1400, 182 USPQ 108, 110 (CCPA 1974).

<u>Likelihood of Confusion</u>

Our determination under Section 2(d) is based on an analysis of all of the probative facts in evidence that are relevant to the factors bearing on the issue of likelihood of confusion. *In re E I. du Pont de Nemours & Co.,*

Opposition No. 91170112

476 F.2d 1357, 177 USPQ 563, 567 (CCPA 1973); *see also, In re Majestic Distilling Company, Inc.,* 315 F.3d 1311, 65 USPQ2d 1201, 1203 (Fed. Cir. 2003).

A.  <u>The fame of opposer's marks</u>.

This *du Pont* factor requires us to consider the fame of opposer's mark.  Fame, if it exists, plays a dominant role in the likelihood of confusion analysis because famous marks enjoy a broad scope of protection or exclusivity of use.  A famous mark has extensive public recognition and renown. *Bose Corp. v. QSC Audio Products Inc.,* 293 F.3d 1367, 63 USPQ2d 1303, 1305 (Fed. Cir. 2002); *Recot Inc. v. M.C. Becton,* 214 F.3d 1322, 54 USPQ2d 1894, 1897 (Fed. Cir. 2000); *Kenner Parker Toys, Inc. v. Rose Art Industries, Inc.,* 963 F.2d 350, 22 USPQ2d 1453, 1456 (Fed. Cir. 1992).

Fame may be measured indirectly by the volume of sales and advertising expenditures of the goods and services identified by the marks at issue, "by the length of time those indicia of commercial awareness have been evident," widespread critical assessments and through notice by independent sources of the products identified by the marks, as well as the general reputation of the products and services.  *Bose Corp. v. QSC Audio Products Inc.,* 63 USPQ2d at 1305-1306 and 1309.  Although raw numbers of product sales and advertising expenses may have sufficed in certain circumstances to prove fame of a mark, raw numbers alone may

Opposition No. 91170112

be misleading. The context surrounding the raw statistics may be necessary (*e.g.,* the substantiality of the sales or advertising figures as compared to those providing comparable products or services). *Bose Corp. v. QSC Audio Products Inc.,* 63 USPQ2d at 1309.

Finally, because of the extreme deference that we accord a famous mark in terms of the wide latitude of legal protection it receives, and the dominant role fame plays in the likelihood of confusion analysis, it is the duty of the party asserting that its mark is famous to clearly prove it. *Leading Jewelers Guild Inc. v. LJOW Holdings LLC,* 82 USPQ2d 1901, 1904 (TTAB 2007).

Opposer introduced evidence of the following to establish the fame of its mark:

1.    Opposer began using the COACH mark at least as early as December 28, 1961;[7]

---

[7] Registration No. 0751493 (Opposer's first notice of reliance, Exhibit 217).   The application maturing into Registration No. 0751493 was filed on December 28, 1961.  *J.C. Hall Co. v. Hallmark Cards, Inc.,* 340 F.2d 960, 144 USPQ 435, 437 (CCPA 1965) ("The presumption of use emanating from the fact of registration relates back to the filing date of the application on which the registration is predicated"); *Brewski Beer Co. v. Brewski Bros. Inc.,* 47 USPQ2d 1281, 1284 (TTAB 1998) (plaintiff may rely on its pleaded registration to prove its mark was in use as of the filing date of the application); *see also* Trademark Rule 2.122(b)(2) (the date of use in a registration is not evidence on behalf of the registrant; "a date of use must be established by competent evidence").   Opposer contends that it has been using the COACH mark since 1957 relying on its answer to interrogatory No. 10 (Sadler Testimony Dep., Exhibit 450) and an excerpt from Coach 60 Years of American Style (Sadler Testimony Dep., Exhibit 457).   Opposer may not rely on its own answer to an interrogatory except under specific circumstances not present in this case.

14

Opposition No. 91170112

2. There are approximately 400 COACH retail stores throughout all 50 states;[8]

3. Opposer's COACH products are also sold by approximately 1,000 third-party retailers throughout the United States;[9]

4. In 2008, opposer's annual sales were approximately three-and-a-half billion dollars;[10]

5. In 2008, opposer spent "about 30 to $60 million a year" on advertising;[11]

6. Opposer has advertised in fashion magazines and regional magazines such as *Elle, Vogue, Mademoiselle, New Yorker, New York Magazine, Cosmopolitan,* and *Vanity Fair*;[12]

7. Opposer has advertised in newspapers in major metropolitan areas, such as the *New York Times, New York*

---

Trademark Rule 2.120(j). Exhibit 457 does not show a date of use earlier than December 1961. In any event, the difference between 1957 and 1961 did not affect our decision.

[8] Sadler Testimony Dep., p. 27.

[9] Sadler Testimony Dep., pp. 20-21.

[10] Sadler Testimony Dep., p. 24. Ms. Sadler did not specify whether her testimony referred to sales limited to the United States or to worldwide sales.

[11] Sadler Testimony Dep., p. 23. Ms. Sadler did not specify whether her testimony referred to advertising expenditures limited to the United States or to worldwide advertising. Also, Ms. Sadler testified that, "[i]f you include design and promotional expenditures with advertising, it is closer to 125 million." (Sadler Testimony Dep., p. 23). However, Ms. Sadler did not explain what she meant by "design and promotional expenditures" vis-à-vis "advertising" expenditures.

[12] Sadler Discovery Dep., p. 67; Opposer's first notice of reliance, Exhibits 119-204; Sadler Testimony Dep., Ex. 453.

Opposition No. 91170112

*Post, Chicago Tribune,* and *Boston Globe,* as well as in smaller cities;[13]

    8.  Opposer's COACH products have received unsolicited publicity in numerous newspapers and magazines discussing fashion trends;[14]

    9.  Opposer has been the subject of newspaper and magazine articles which refer to the renown of opposer and its products.[15]  The following excerpts are representative of the publicity opposer has received:

> *New York Times* (July 27, 1999)-
>
> Coach, one of the top makers of status handbags in the United States, is engaged in the balancing act that many classic brands are facing:  how to attract a new breed of shopper while continuing to cater to old faithfuls.
>
>     \*    \*    \*
>
> He renamed the new company Coach, and the Coach bags, mostly made of saddle and bridal leathers in sport shapes modeled after feed bags and saddlebags, became the everyday bag of choice for thousands of working women in the 60's, 70's and 80's.[16]

---

[13] Sadler Discovery Dep., 69; Opposer's first notice of reliance, Exhibits 43-118.  Opposer does not advertise on television or radio.  (Sadler Discovery Dep., p. 67).

[14] Opposer's second notice of reliance, Exhibits 237-446.

[15] Opposer's second notice of reliance, Exhibits 240, 241, 245, 269, 272, 304, 320, 345, and 369.  Exhibit 398 is from the *Vogue.co.uk* website, a website originating in the United Kingdom. Because opposer did not provide any support for why consumers in the United States would access a website from the U.K., we have not given it any consideration.  *In re Bayer Aktiengesellschaft,* 82 USPQ2d 1828, 1835 (Fed. Cir. 2007).

[16] *Id.* at Exhibit 240.

Opposition No. 91170112

> *Seattle* (April 2001)-
>
> Since 1941, the name Coach has been
> synonymous with quality leather bags and
> accessories for men and women.[17]
> *New York Post* (November 27, 2002)
>
> **Coach** famous for their fine quality
> handbags and leather goods, offers an
> array of well-made small items that
> would delight anyone on your gift
> list.[18]

10. Opposer's March 2008 internal brand awareness study.[19] Because this document was designated as confidential, we refer to it only in general terms. The brand awareness study has limited probative value because there was no witness with first-hand knowledge to testify about the study. Ms. Sadler merely authenticated the report by testifying that the study was done in the regular course of opposer's business and that it was a business record.[20] Furthermore, it appears that the study focused on the brand awareness of women between the ages of 13-24, rather than the entire population. Nevertheless, the results of opposer's brand awareness study, conducted in 2007 and issued in March 2008, shows that there is a high-level of brand awareness in connection with opposer's COACH mark; and

---

[17] *Id.* at Exhibit 269.
[18] *Id.* at Exhibit 304.
[19] Sadler Testimony Dep., Exhibit 456.
[20] Sadler Testimony Dep., pp. 28-29.

Opposition No. 91170112

11. Opposer's products are the subject of counterfeiting.[21]

Based on this record, we find that opposer's COACH mark is famous for purposes of likelihood of confusion. However, this factor alone is not sufficient to establish likelihood of confusion. If that were the case, having a famous mark would entitle the owner to a right in gross, and that is against the principles of trademark law. *See University of Notre Dame du Lac v. J. C. Gourmet Imports Co., Inc.,* 703 F.2d 1372, 217 USPQ 505, 507 (Fed. Cir. 1983):

> The fame of the [plaintiff's] name is insufficient in and of itself to establish likelihood of confusion under §2(d). "Likely***to cause confusion" means more than the likelihood that the public will recall a famous mark on seeing the same mark used by another. It must also be established that there is a reasonable basis for the public to attribute the particular product or service of another to the source of the goods or services associated with the famous mark. To hold otherwise would result in recognizing a right in gross, which is contrary to the principles of trademark law and to concepts embodied in 15 USC § 1052(d).

*See also Recot Inc. M.C. Becton,* 214 F.3d 1322, 54 USPQ2d 1894, 1898 (Fed. Cir. 2000) ("fame alone cannot overwhelm the other *du Pont* factors as a matter of law"). In this case, we find that the differences in the goods, as well as the different commercial impressions engendered by the

---

[21] Sadler Testimony Dep., pp. 22, 24-25, 30-31 and Exhibit 459.

Opposition No. 91170112

marks, are significant countervailing factors dispelling any likelihood of confusion.  *See Blue Man Productions Inc. v. Tarmann,* 75 USPQ2d 1811, 1819-1820 (TTAB 2005), *rev'd on other grounds,* Civil Action No. 05-2037 (D.D.C. April 3, 2008).

B.  <u>The similarity or dissimilarity and nature of the goods described in the applications and registrations, the channels of trade and classes of consumers</u>.

There are clear and significant differences between applicant's goods, educational materials for preparing for standardized tests, and the various products identified in opposer's registrations including, *inter alia,* handbags, men's and women's fashion accessories, business cases, luggage, travel accessories, personal planning products, leather outerwear, and clothing.  While opposer uses its mark on a myriad of consumer products, it does not use COACH to identify educational products,[22] notwithstanding its production of an instructional video to help U.S. Customs identify counterfeit products.[23]

Opposer contends that because applicant uses its marks on shirts,[24] caps,[25] and tote bags,[26] the products are related.  However, applicant is not seeking to register its

---

[22] Sadler Testimony Dep., pp. 11, 57-58, 60 and Exhibits 213-215 and 451-452; Sadler Discovery Dep., pp. 30-32, 35, 37, 39-40.
[23] Sadler Testimony Dep., p. 22.
[24] Fisher Testimony Dep., Exhibits 148 and 149.
[25] *Id.* at Exhibit 150.
[26] *Id.* at Exhibits 151 and 152.

Opposition No. 91170112

COACH marks for shirts, caps, and tote bags, and we are
constrained to determine the issue of likelihood of
confusion based on the goods identified in the description
of goods. *Cunningham v. Laser Golf Corp.,* 55 USPQ2d at
1846; *Canadian Imperial Bank of Commerce v. Wells Fargo
Bank,* 811 F.2d 1490, 1 USPQ2d 1813, 1815 (Fed. Cir. 1987);
*CBS Inc. v. Morrow,* 708 F.2d 1579, 218 USPQ 198, 199 (Fed.
Cir. 1983).

Opposer sells its products through its 400 retail
stores and through numerous third-party retailers.[27] It
advertises in newspapers, fashion magazines and catalogs
targeting female consumers between the ages of 25-65 in all
income brackets.[28] Applicant markets its products through
catalogs, direct mail, and personal sales representatives.[29]
Applicant targets educational professionals with
administrative responsibility for purchasing educational
materials.[30] Although educational professionals may include
females between the ages of 25-65, educational materials for
preparing for standardized tests and handbags and fashion
accessories are not sold under circumstances likely to give
rise to the mistaken belief that the products emanate from

---

[27] Sadler Testimony Dep., pp. 20-21, 27.
[28] Sadler Testimony Dep., p. 19 and Exhibit 453 and 456; Sadler
Discovery Dep., pp. 67-69; Opposer's first notice of reliance,
Exhibits 43-118-204.
[29] Fisher Testimony Dep., pp. 113-114, 155.
[30] Fisher Testimony Dep., p. 156.

Opposition No. 91170112

the same source.  In fact, we presume that educational professionals responsible for purchasing educational materials for school systems are likely to exercise a very high degree of care in making their purchasing decision, thus, minimizing any likelihood of confusion.

Because applicant's description of goods is not limited to sales to educational professionals, it is presumed that the scope of the goods encompasses all of the goods of the nature and type described, that they would travel in all channels of trade normal for those goods and to all classes of prospective purchasers for those goods.  *In re Linkvest S.A.,* 24 USPQ2d 1716, 1716 (TTAB 1992); *In re Elbaum*, 211 USPQ 639, 640 (TTAB 1981).  Even if applicant's educational materials for preparing standardized examinations were sold to students in general, or to the parents of such students, we find that the products at issue would not be sold under circumstances likely to give rise to the mistaken belief that educational materials for preparing for standardized tests and leather bags and fashion accessories emanate from the same source.

In view of the foregoing, we find that the goods are not related and that the channels of trade are distinct. However, because the classes of consumers presumptively include students and parents of students, the classes of consumers may overlap.

Opposition No. 91170112

C. The similarity or dissimilarity of the marks in their entireties as to appearance, sound, connotation and commercial impression.

We now turn to the *du Pont* likelihood of confusion factor focusing on the similarity or dissimilarity of the marks in their entireties as to appearance, sound, connotation and commercial impression. *In re E.I. du Pont De Nemours & Co.,* 177 USPQ at 567. Each of these characteristics of a mark must be considered. *Palm Bay Imports Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772,* 396 F.3d 1369, 73 USPQ2d 1689, 1692 (Fed. Cir. 2005) (appearance, sound, meaning and commercial impression are separate factors bearing on the ultimate conclusion of whether marks are, overall, similar). The similarity of the marks in regard to one of these factors can be critical to a finding of similarity. *See TBC Corp. v. Holsa Inc.*, 126 F.3d 1470, 44 USPQ2d 1315, 1318 (Fed. Cir. 1997) (phonetic similarity may be critical when goods are advertised via radio or when business is done by telephone); s*ee also In re Sarkli, Ltd.*, 721 F.2d 353, 220 USPQ 111, 113 (Fed. Cir. 1983) ("the PTO may reject an application ex parte solely because of similarity in meaning of the mark sought to be registered with a previously registered mark"); *but see Bost Bakery, Inc. v. Roland Industries, Inc.*, 216 USPQ 799, 801 (TTAB 1991) ("the principle that similarity between marks in meaning or commercial significance alone may be sufficient

22

Opposition No. 91170112

to create a likelihood of confusion is applicable primarily
to situations where marks are coined or arbitrary rather
than highly suggestive.") However, the law does not counsel
that similarity in one factor alone automatically results in
a finding that the marks are similar.

The involved marks are clearly identical in terms of
appearance and sound. In contrast, the marks are different
in their connotations and commercial impressions, a fact
which we find critical in this case. In considering
connotation and overall commercial impression, we are
compelled to consider the nature of the respective goods and
services. *See, e.g., TBC Corp. v. Holsa*, *supra*, 44 USPQ2d
at 1316 (court discounted "distinct connotation" of GRAND
SLAM in relation to bridge, baseball, golf and tennis as
irrelevant and noted that "with respect to automobile tires
GRAND SLAM is wholly arbitrary"); *Viacom International Inc.
v. Komm,* 46 USPQ2d 1233, 1238 (TTAB 1998) (the word "mouse"
has different meanings when applied to a computer peripheral
and a cartoon superhero); *Bost Bakery, supra*, 216 USPQ at
801-802 ("Hearth" highly suggestive as applied to bread but
"Heritage" largely arbitrary as applied to such goods);

Opposer's COACH mark, when applied to fashion
accessories is clearly either arbitrary or suggestive of
carriage or travel accommodations (*e.g.,* stagecoach, train,
motor coach, etc.) thereby engendering the commercial

Opposition No. 91170112

impression of a traveling bag (*e.g.*, a coach or carriage bag). On the other hand, applicant's COACH marks call to mind a tutor who prepares a student for an examination. In view of the completely different meanings and commercial impressions engendered by the marks, we find that applicant's COACH marks are not similar to opposer's COACH mark.

In an analogous situation, the Board found that the mark BOTTOMS UP when used in connection with men's suits, coats and trousers engenders a different commercial impression from BOTTOMS UP for women's underwear and, therefore, was not likely to cause confusion. *In re Sydel Lingerie Co., Inc.*, 197 USPQ 629 (TTAB 1977).

> But more important, and especially in this case is the nature of the marks and the commercial impression that they project in connection with the respective goods. Thus, if "BOTTOMS UP" can be deemed to have any suggestive connotation as applied to men's suits, coats and trousers, it will be in association with the drinking phrase, "drink up!" … This is hardly the connotation that "BOTTOMS UP" would generate as applied to applicant's ladies' and children's underwear.

*In re Sydel Lingerie Co., Inc.*, 197 USPQ at 630; *see also In re Sears, Roebuck and Co.*, 2 USPQ2d 1312 (TTAB 1987) (CROSS-OVER for brassieres creates a different commercial impression from CROSSOVER for ladies' sportswear); and *In re British Bulldog, Ltd.*, 224 USPQ 854 (TTAB 1984) (PLAYERS for

24

Opposition No. 91170112

shoes engenders a different commercial impression from
PLAYERS for underwear).

D.   <u>Balancing the factors</u>.

Notwithstanding the facts that opposer's mark is famous
and that the classes of consumers may overlap, because the
goods of the parties are not similar or related in any way,
because the goods move in different channels of trade, and
because the marks, as used by the parties, have different
meanings and engender different commercial impressions, we
find that applicant's use of its COACH marks for
"educational materials for preparing for standardized tests"
is not likely to cause confusion with opposer's COACH marks
for handbags and opposer's wide variety of consumer fashion
products and accessories.

<u>Dilution</u>

In addition to its Section 2(d) claim, opposer has
asserted a dilution claim.  The Trademark Act provides for a
cause of action for the dilution of famous marks.  Sections
13 and 43(c) of the Trademark Act of 1946, 15 U.S.C. §§1063
and 1125(c).

The Trademark Act provides as follows:[31]

> Subject to the principles of equity, the
> owner of a famous mark that is
> distinctive, inherently or through
> acquired distinctiveness, shall be
> entitled to an injunction against

---

[31] Section 43(c) as it pertains to dilution has been amended
effective October 6, 2006.

Opposition No. 91170112

> another person who, at any time after
> the owner's mark has become famous,
> commences use of a mark or trade name in
> commerce that is likely to cause
> dilution by blurring or dilution by
> tarnishment of the famous mark,
> regardless of the presence or absence of
> actual or likely confusion, of
> competition, or of actual economic
> injury.

Opposer contends that applicant's marks will "blur" the distinctiveness of opposer's COACH mark.[32] The Trademark Act defines dilution by blurring as follows:

> "dilution by blurring" is association
> arising from the similarity between a
> mark or trade name and a famous mark
> that impairs the distinctiveness of the
> famous mark.[33]

Opposer also contends that applicant's marks will "tarnish" the reputation of opposer's COACH mark.[34] The Trademark Act defines dilution by tarnishment as follows:

> "dilution by tarnishment" is an
> association arising from the similarity
> between a mark or trade name and a
> famous mark that harms the reputation of
> the famous mark.[35]

Our dilution analysis, therefore, requires consideration of the following issues:

1. Whether opposer's COACH mark is famous;

2. Whether opposer's COACH mark became famous prior

---

[32] Opposer's Brief, p. 32-33.
[33] Section 43(c)(2)(B) of the Trademark Act of 1946,
15 U.S.C. §1125(c)(2)(B).
[34] Opposer's Brief, pp. 32-33.
[35] Section 43(c)(2)(C) of the Trademark Act of 1946,
15 U.S.C. §1125(c)(2)(C).

Opposition No. 91170112

to applicant's use of its COACH marks; and

3.    Whether applicant's COACH mark is likely to cause dilution by blurring the distinctiveness of opposer's COACH mark or by tarnishing the reputation of opposer's COACH mark.

A.    <u>The fame of opposer's mark</u>.

Although we have found that COACH is famous for purposes of opposer's likelihood of confusion claim, we must now determine whether COACH is famous in the context of a dilution claim.  Fame for likelihood of confusion and dilution is not the same.  Fame for dilution requires a more stringent showing.  *Palm Bay Imports Inc. v. Veuve Clicquot*, *supra*, 73 USPQ2d at 1694; *Toro Co. v. ToroHead Inc.,* 61 USPQ2d 1164, 1170 (TTAB 2001).  Likelihood of confusion fame "varies along a spectrum from very strong to very weak" while dilution fame is an either/or proposition – it either exists or it does not exist.  *Id.; see also Carefirst of Maryland Inc. v. FirstHealth of the Carolinas Inc.,* 77 USPQ2d 1492, 1507 (TTAB 2005) (likelihood of confusion "[f]ame is relative . . . not absolute").  A mark, therefore, may have acquired sufficient public recognition and renown to be famous for purposes of likelihood of confusion without meeting the more stringent requirement for dilution fame.  *Toro Co. v. ToroHead Inc.,* 61 USPQ2d at 1170, *citing I.P. Lund Trading ApS v. Kohler Co.,* 163 F.3d 27, 47 USPQ2d 1225, 1239 (1st Cir. 1998) ("[T]he standard for fame and distinctiveness required to obtain anti-

Opposition No. 91170112

dilution protection is more rigorous than that required to seek infringement protection").

In *Toro,* we described the requirements for proving that a mark is famous:

> While the eight statutory factors are a guide to determine whether a mark is famous, ultimately we must consider all the evidence to determine whether opposer has met its burden in demonstrating that the relevant public recognizes the [COACH] mark as "signifying something unique, singular, or particular." H.R. REP. No. 104-374, at 3 (1995). Because famous marks can be diluted by the use of similar marks on non-competitive goods and services, the owner of a famous mark must show that there is a powerful consumer association between the term and the owner.
>
>        *    *    *    *
>
> Fame for dilution purposes is difficult to prove.
>
>        *    *    *    *
>
> Therefore, an opposer . . . must provide evidence that when the public encounters opposer's mark in almost any context, it associates the term, at least initially with the mark's owner. . . . Examples of evidence that show the transformation of a term into a truly famous mark include:
>
>      1.    Recognition by the other party.
>
>      2.    Intense media attention.
>
>      3.    Surveys.
>
>        *    *    *    *
>
> But in order to prevail on the ground of dilution the owner of a mark alleged to be famous must show a change has

28

Opposition No. 91170112

> occurred in the public's perception of
> the term such that it is now primarily
> associated with the owner of the mark
> even when it is considered outside of
> the context of the owner's goods or
> services.

*Toro Co. v. ToroHead Inc.,* 61 USPQ2d at 1180-1181. In other

words, "the transformation of a term into a truly famous

mark" means that "the mark must be a household name." *Thane*

*International, Inc. v. Trek Bicycle Corp.,* 305 F.3d 894, 64

USPQ2d 1564, 1575 (9th Cir. 2002).

Opposer's evidence regarding fame is recounted *supra* at

pages 14-18. This evidence is not sufficient to show that

opposer's mark is famous for purposes of dilution. In

concluding that opposer has not met the stringent

requirements of proving fame for purposes of dilution, we

note that opposer's evidence of fame falls far short of the

quantum and quality of evidence introduced in *NASDAQ Stock*

*Market Inc. v. Antartica S.r.l.,* 69 USPQ2d 1718 (TTAB 2003),

that was found sufficient to prove that opposer's mark was

famous for dilution purposes. In *NASDAQ Stock Market Inc.,*

opposer introduced market studies demonstrating that the

awareness of opposer's stock market among investors reached

more than 80% in 1999. In this case, opposer's brand

awareness study is of dubious probative value because

opposer did not proffer a witness with first-hand knowledge

of the study to explain how the study was conducted and the

significance of the study. Moreover, to the extent that we

Opposition No. 91170112

were able to extrapolate any significance from the findings in the study, the study showed a high level of brand awareness in women ages 13-24 but provided no evidence of about the brand awareness among women in general or men. In addition, the opposer in *NASDAQ Stock Market Inc.* introduced dictionary references, newspaper and magazine articles, and stock market reports that evidenced a widespread recognition of opposer's mark, beyond just investors. The media evidence introduced by opposer herein fails to show a widespread recognition of opposer's mark to the general population. For example, the vast majority of unsolicited media recognition for opposer's COACH mark comprises a reference to one of opposer's products as one of many different fashion buys or trends,[36] and the news articles noting opposer's renown are too few to support a finding that opposer's mark has been transformed into a household name. Contrary to opposer's contention, we are not persuaded that opposer is the subject of "intense" media recognition.[37] Finally, opposer has submitted evidence of

---

[36] *See, e.g.,* opposer's first notice of reliance Exhibit 276-284.
[37] Opposer's rebuttal brief, p. 20. We are not persuaded by opposer's assertion that it has engaged in joint marketing efforts with other companies such as LEXUS automobiles and CANON cameras. (Sadler Testimony Dep., p. 32). Opposer failed to provide any testimony regarding the success of the joint marketing efforts and the effect of those efforts in promoting opposer's mark. Furthermore, opposer's reference to its eighteen incontestable trademark registrations is equally unavailing in opposer's effort to prove the fame of its mark. (Opposer's rebuttal brief, p. 20). The fact that opposer's federally-registered trademarks have achieved incontestable status means

Opposition No. 91170112

its sales and advertising expenditures only for one year, in 2008, and these figures represent its activities worldwide, without breaking down the figures to sales and advertising in the United States.

In view of the foregoing, we find that opposer has not established that COACH is famous for dilution purposes.

B.  <u>When opposer's mark became famous?</u>

Even assuming that opposer's mark is famous for purposes of dilution, we cannot determine when opposer's mark became famous.  "In a use-based application under Section 1(a) of the Trademark Act, 15 U.S.C. § 1051(a), the party alleging fame must show that the mark had become famous prior to the applicant's use of the mark."  *Toro Co. v. ToroHead Inc.,* 56 USPQ2d at 1174 n.9; see *also* Section 43(c)(1) of the Trademark Act of 1946 which provides that "the owner of a famous mark … shall be entitled to an injunction against another who, **at any time after the owner's mark has become famous, commences use of a mark** or trade name in commerce that is likely to cause dilution." (Emphasis added).  Since the applications at issue are use-based applications, opposer must prove that its COACH mark

---

that they are conclusively considered to be valid; it does not dictate that the mark is "strong" for purposes of determining likelihood of confusion.  *Safer Inc. v. OMS Investments Inc.,* 94 USPQ2d 1031, 1036 (TTAB 2010).  Likewise, incontestable registrations do not prove that a mark is famous for purposes of dilution.

Opposition No. 91170112

became famous prior to any proven first use of COACH by applicant or, if none is proven, then at least prior to the filing date of the applications (December 20 and 21, 2004).

Because a date of first use alleged in an application is subject to proof, a plaintiff claiming dilution need not necessarily allege and prove the acquisition of fame prior to the particular use date asserted in a use-based application, but must allege and prove the acquisition of fame prior to "the applicant's use of the mark," whenever that use may be shown, at trial, to have occurred. The earliest evidence of technical trademark use for the mark COACH in connection with educational materials for preparing for standardized tests is in applicant's Fall 2003 Catalog for Georgia.[38] In the 2003 catalog, COACH is used as a stand alone mark on CD-ROMs. *See examples below.*

---

[38] Fisher Testimony Dep., Exhibit 45; *see also* Exhibits 90-92.

Opposition No. 91170112

Cover page-



Page 12-



Based on Ms. Sadler's testimony regarding opposer's sales and advertising expenditures, the number of opposer's stores and the number of third-party retailers that sell opposer's products, and opposer's 2008 brand awareness study, we can conclude that opposer's mark was famous in

Opposition No. 91170112

2008 as we did when we determined that opposer's mark is famous for purposes of likelihood of confusion.  However, the remaining evidence (*i.e.,* the unsolicited media notices, long use of the mark, and counterfeiting problems), is not sufficient to allow us to find that opposer's mark became famous prior to the fall of 2003.  In view thereof, we find that opposer failed to meet its burden of proving that its COACH mark became famous prior to applicant's first use of its COACH marks.

On this record, opposer cannot prevail on its dilution claim because we have found that opposer has not met its burden of proving that its COACH mark is famous for purposes of dilution or that its COACH mark became famous prior to applicant's first use of its COACH marks.  Nevertheless, for purposes of completeness, we discuss dilution by blurring and tarnishment.

C.  <u>Dilution by blurring</u>.

"Dilution diminishes the 'selling power that a distinctive mark or name with favorable associations has engendered for a product in the mind of the consuming public.'"  *Toro Co. v. ToroHead Inc.,* 61 USPQ2d at 1182, *quoting Sally Gee, Inc. v. Myra Hogan, Inc.,* 699 F.2d 621, 624-25, 217 USPQ 658, 661 (2nd Cir. 1983).  Dilution by blurring occurs when a substantial percentage of consumers, upon seeing the junior party's use of a mark on its goods

Opposition No. 91170112

[in this case COACH used in connection with educational
materials for preparing for standardized tests], are
immediately reminded of the famous mark [in this case COACH
for the various products identified in opposer's
registrations including, *inter alia,* handbags, men's and
women's fashion accessories, business cases, luggage, travel
accessories, personal planning products, leather outerwear,
and clothing] and associate the junior party's use with the
owner of the famous mark, even if they do not believe that
the goods come from the famous mark's owner. *Toro Co. v.
ToroHead Inc.,* 61 USPQ2d at 1183.

The Board may look to all relevant facts in determining
whether applicant's COACH marks will blur the
distinctiveness of opposer's COACH mark. The Trademark Act
provides the following guidance:

> In determining whether a mark or trade
> name is likely to cause dilution by
> blurring, the court may consider all
> relevant factors, including the
> following:
>
> (i) The degree of similarity between the
> mark or trade name and the famous mark.
>
> (ii) The degree of inherent or acquired
> distinctiveness of the famous mark.
>
> (iii) The extent to which the owner of
> the famous mark is engaging in
> substantially exclusive use of the mark.
>
> (iv) The degree of recognition of the
> famous mark.
>
> (v) Whether the user of the mark or

35

Opposition No. 91170112

> trade name intended to create an
> association with the famous mark.
>
> (vi) Any actual association between the
> mark or trade name and the famous mark.

1. The degree of similarity between the mark or trade name and the famous mark.

For purposes of dilution, a party must prove more than confusing similarity; it must show that the marks are "identical or very substantially similar." *Carefirst of Maryland Inc. v. FirstHealth of the Carolinas Inc.,* 77 USPQ2d *at* 1514, *quoting Toro Co. v. ToroHead, Inc.,* 61 USPQ2d at 1183; *see also Citigroup, Inc. v. Capital City Bank Group, Inc.,* 94 USPQ2d 1645, 1666 (TTAB 2010). As the Board explained in *Toro Co. v. ToroHead, Inc.*:

> The test for blurring is not the same as
> for determining whether two marks are
> confusingly similar for likelihood of
> confusion purposes. "To support an
> action for dilution by blurring, 'the
> marks must be similar enough that a
> significant segment of the target group
> sees the two marks as essentially the
> same.'" *Luigino's, Inc.,* 170 F.3d at
> 832, 50 USPQ2d at 1051[39] (quoting 2
> McCarthy on Trademarks and Unfair
> Competition, §24:90.1 (4th ed. 1998).
> Therefore, differences between the marks
> are often significant. Mead Data (LEXUS
> for cars did not dilute LEXIS for
> database services).[40]

*Toro Co. v. ToroHead, Inc.,* 61 USPQ2d at 1183 (TORO and

---

[39] *Luigino's , Inc. v. Stouffer Corp.,* 170 F.3d 827, 50 USPQ2d 1047 (8th Cir. 1999).
[40] *Mead Data Central, Inc. v. Toyota Motor Sales, U.S.A., Inc.,* 875 F.2d 1065, 10 USPQ2d 1961 (2nd Cir. 1989).

Opposition No. 91170112

ToroMR and Design are not substantially similar for dilution
purposes).

For purposes of determining the degree of similarity
between applicant's mark and the famous mark in the dilution
analysis, we will use the same test as for determining the
similarity or dissimilarity of the marks in the likelihood
of confusion analysis, that is, the similarity or
dissimilarity of the marks in their entireties as to
appearance, sound, connotation and commercial impression.
In our discussion of likelihood of confusion, we found the
marks dissimilar because applicant's COACH marks and
opposer's COACH mark engender different meanings and evoke
different commercial impressions. In particular, we found
the different meanings of the respective marks attributable
to the nature of the respective goods and services. The
fact that dilution is a claim that may lie even when goods
or services are disparate does not provide a basis for
disregarding the nature of the involved goods and services,
when considering whether marks are similar for dilution
purposes. The nature of the involved goods and services are
routinely considered when marks are assessed for similarity
in the likelihood of confusion analysis, for
descriptiveness, to determine whether they may be scandalous
or immoral, and in other contexts. We see no compelling
reason why the analysis of the similarity of marks in a

37

Opposition No. 91170112

dilution analysis should depart from this accepted practice.[41]

We see the involved marks as dissimilar, because of their distinct meanings and commercial impressions. Opposer has not shown that its COACH mark and the connotation it presents in regard to opposer's products, has become the "principal meaning" of the mark so that, when applicant's COACH marks are considered in regard to its products and services, consumers of those products and services will no longer think of the common, descriptive meaning of an academic coach or tutor and instead will primarily think of opposer. *See Toro Co. v. ToroHead Inc., supra,* 61 USPQ2d at 1180 (owner of the famous mark "must demonstrate that the common or proper noun uses of the term and third-party uses of the mark are now eclipsed by the owner's use of the mark").

Because we find that the marks are not similar, we certainly cannot find the marks as being essentially the

_____

[41] The case at hand, and its necessary focus on the meanings of the respective marks in the context of a dilution claim, presents a rather unique situation, not previously addressed by the Board in a precedential decision. In *Viacom, supra,* the very different meanings ascribed to MIGHTY MOUSE and MY-T-MOUSE, because of the involved disparate goods and services contributed to dismissal of the opposition, but the case did not involve a dilution claim. In *Hormel Foods Corporation and Hormel Foods, LLC v. Spam Arrest, LLC*, (Cancellation No. 92042134; November 21, 2007), the Board considered a dilution claim involving plaintiffs' famous SPAM mark for canned meat products and defendant's mark SPAM ARREST (SPAM disclaimed) for a software product designed to eliminate unsolicited commercial email. However, the Board denied the petition for cancellation in a nonprecedential decision.

Opposition No. 91170112

same, the higher standard required in dilution cases. Therefore, the similarity, or in this case, dissimilarity of the marks favors applicant.

      2.   <u>The degree of inherent or acquired distinctiveness of the famous mark.</u>

As indicated previously, COACH is an arbitrary or suggestive (though not highly suggestive) term when used in connection with hand bags and fashion accessories. Accordingly, because COACH is arbitrary or suggestive, this dilution factor favors opposer.

      3.   <u>The extent to which the owner of the famous mark is engaging in substantially exclusive use of the mark</u>.

Although opposer introduced excerpts from websites featuring 43 book and software titles including the word "Coach,"[42] and applicant introduced 25 third-party registrations for marks that include the word "Coach," applicant did not introduce any evidence as to the extent of the third-parties' use and promotion of their marks (or the books). Third-party registrations alone are not evidence of use. *Smith Bros. Mfg. Co. v. Stone Mfg. Co.,* 476 F.2d 1004, 177 USPQ 462, 463 (CCPA 1973) (the purchasing public is not aware of registrations reposing in the U.S. Patent and Trademark Office); *In re Hub Distributing, Inc.,* 218 USPQ

---

[42] Opposer introduced the third-party evidence to support its claim that applicant's COACH marks are descriptive. *See* the discussion below.

Opposition No. 91170112

284, 285 (TTAB 1983). Without such evidence, we cannot assess whether third-party use has been so widespread as to have had any impact on consumer perceptions. *Cf. National Motor Bearing Co. v. James-Pond Clark,* 266 F.2d 709, 121 USPQ 515, 517 (CCPA 1959)("evidence of present third party usage . . . indicates a conditioning of the public mind to the common feature, thereby decreasing any likelihood of confusion"); *Freedom Federal Savings & Loan Ass'n v. Heritage Federal Savings & Loan Ass'n,* 210 USPQ 227, 231 (TTAB 1981)(third-party use of marks without more is not probative of the impact that such marks have on consumer perceptions). Accordingly, on this record, we conclude that opposer has made substantially exclusive use of the COACH trademark, and therefore, this dilution factor favors opposer.

    4. <u>The degree of recognition of the famous mark</u>.

    This Congressionally mandated factor seems redundant in view of the fact that opposer must establish that its mark is famous as a prerequisite for establishing a dilution claim. Nevertheless, it is a factor that we must consider under the statute. We conclude, therefore, that the degree of recognition of the famous mark requires us to determine the level of fame acquired by the famous mark. In other words, once the mark is determined to be famous as a prerequisite for dilution protection, we must apply a

40

Opposition No. 91170112

sliding scale to determine the extent of that protection
(*i.e.,* the more famous the mark, the more likely there will
be an association between the famous mark and the
defendant's mark).[43]

As indicated above, we have found that COACH is famous
for purposes of likelihood of confusion but not for
dilution.  Thus, COACH has not acquired an extraordinary
degree of recognition such that it "is now primarily
associated with the owner of the mark even when it is
considered outside of the context of the owner's goods and
services" such that the mark has become part of the
vernacular.  *Toro Co. v. ToroHead, Inc.,* 61 USPQ2d at 1180-
1181.  Accordingly, we find that this dilution factor favors
applicant.

    5.    Whether the user of the mark or trade name
          intended to create an association with the famous
          mark.

Opposer failed to present any evidence demonstrating
that applicant intended to create an association with
opposer's COACH trademark.  In this regard, Ms. Fisher
testified that as part of applicant's effort to standardize
and emphasize the COACH trademark, applicant began using the

---

[43] We have not found any other federal cases noting this apparent
redundancy.  With respect to "the degree of the recognition of
the famous mark" factor, district courts and courts of appeal
simply rehash their discussion regarding the fame of the
plaintiff's mark.

Opposition No. 91170112

logo of the coach figure, as well as the tagline "America's
Best for Student Success."[44]

> We wanted a mascot with our logo because
> it was a little more student friendly, a
> little more approachable.
>
> It was more of a cartoon figure so that
> it was not absolutely a kind of in-your-
> face male or female, which was a
> sensitive point to discuss as well, and
> so this [the coach figure] was
> created.[45]
>
> $*$ $*$ $*$
>
> But we tried to make it a friendly kind
> of athletic coach so that it would be
> kind of fun for kids because test
> preparation is kind of distasteful.[46]

There is simply no evidence to show that applicant tried to
create an association with opposer's mark.  In fact, the
testimony shows that applicant tried to evoke the image of
an athletic coach.  In view thereof, this dilution factor
favors applicant.

>    6.    Any actual association between the mark or trade
>          name and the famous mark.

Opposer failed to present any evidence demonstrating
that there is any actual association between applicant's
COACH marks and opposer's COACH trademark.  Since we have no
evidence on which to conclude that potential customers of

---

[44] Fisher Testimony Dep., pp. 126-127, 173-176.
[45] Fisher Testimony Dep., p. 127.
[46] Fisher Testimony Dep., p. 179

Opposition No. 91170112

applicant's products would make any association between the parties' marks when used on their respective products, this dilution factor favors applicant.

      7.  <u>Balancing the factors</u>.

      The facts that the marks are not so substantially similar as to support a dilution claim, that opposer's mark is not famous for purposes of dilution, that there is no evidence demonstrating any association between the parties' marks, and that there is no evidence that applicant intended to create an association with opposer's mark outweigh the distinctiveness and substantially exclusive use of opposer's COACH trademark.  Based on the record before us, opposer has not demonstrated that the registration of applicant's COACH marks will dilute its COACH trademark by blurring.

D.  <u>Dilution by tarnishment</u>.

      Opposer argued that "[a]pplicant's promotional items such as tote bags and clothing bearing the COACH mark may cause a negative association with Coach's famous COACH mark and high-quality goods thereby tarnishing Coach's reputation."[47]  However, as we indicated above, applicant is not seeking to register its COACH marks for tote bags and clothing and, therefore, applicant's use of its marks on those products is not before us.  We are constrained to determine the issue of dilution (blurring and tarnishment)

---

[47] Opposer's Brief, pp. 32-33.

Opposition No. 91170112

based on the goods identified in the description of goods. Finally, there is no evidence in this record suggesting that opposer's mark will suffer any negative association by applicant's use of its marks. In view of the foregoing, opposer has failed to prove its claim of dilution by tarnishment.

Descriptiveness

A term is merely descriptive of goods or services, within the meaning of Section 2(e)(1) of the Trademark Act of 1946, 15 U.S.C. §1052(e)(1), if it forthwith conveys an immediate idea of an ingredient, quality, characteristic, feature, function, purpose or use of the goods or services. *In re Abcor Development Corp.*, 588 F.2d 811, 200 USPQ 215, 217-18 (CCPA 1978). A term need not immediately convey an idea of each and every specific feature of the applicant's goods or services to be merely descriptive; rather, it is sufficient that the term describes one significant attribute, function or property of the goods or services. *In re H.U.D.D.L.E.*, 216 USPQ 358, 359 (TTAB 1982); *In re MBAssociates*, 180 USPQ 338, 339 (TTAB 1973). Whether a term is merely descriptive is determined not in the abstract, but in relation to the goods or services for which registration is sought, the context in which it is being used on or in connection with the goods or services, and the possible significance that the term would have to the average

44

Opposition No. 91170112

purchaser of the goods or services because of the manner of its use; that a term may have other meanings in different contexts is not controlling. *In re Bright-Crest, Ltd.*, 204 USPQ 591, 593 (TTAB 1979). In other words, the question is not whether someone presented with only the mark could guess what the goods are. Rather, the question is whether someone who knows what the goods are will immediately understand the mark as directly conveying information about them (*i.e.,* whether someone familiar with applicant's educational materials for preparing for standardized tests will understand COACH to convey information about the educational materials). *In re Tower Tech Inc.,* 64 USPQ2d 1314, 1317 (TTAB 2002); *In re Patent & Trademark Services Inc.,* 49 USPQ2d 1537, 1539 (TTAB 1998); *In re Home Builders Association of Greenville,* 18 USPQ2d 1313, 1317 (TTAB 1990); *In re American Greetings Corp.,* 226 USPQ 365, 366 (TTAB 1985).

"On the other hand, if one must exercise mature thought or follow a multi-stage reasoning process in order to determine what product or service characteristics the term indicates, the term is suggestive rather than merely descriptive." *In re Tennis in the Round, Inc.,* 199 USPQ 496, 497 (TTAB 1978); *see also In re Shutts,* 217 USPQ 363, 364-365 (TTAB 1983); *In re Universal Water Systems, Inc.,* 209 USPQ 165, 166 (TTAB 1980).

Opposition No. 91170112

A "coach" is "a private tutor who prepares a student for an examination."[48]  Other definitions include "a person who trains an athlete," "a person who instructs an actor or singer," and "to give instruction or advice in the capacity of a coach; instruct."[49]

Opposer introduced into evidence 43 titles of books and software incorporating the word "coach" in the title.[50] Representative samples include the following titles:

1.    The Business Coach;[51]

2.    The Storytelling Coach:  How to Listen, Praise, and Bring out People's Best.[52]  The synopsis on the website describes the book as the author's "basic coaching principles, guidelines for emotional safety, the four obstacles for success, and suggestions for overcoming them;"

3.    Your Writing Coach:  From Concept to Character, from Pitch to Publication.[53]  The synopsis on the website describes this book as showing "aspiring writers how to overcome fear, get past excuses, and start writing;" and

---

[48] The Random House Dictionary of the English Language (Unabridged), p. 393 (2nd ed. 1987).  The Board may take judicial notice of dictionary evidence.  University of Notre Dame du Lac v. J.C. Gourmet Food Imports Co., 213 USPQ 594 (TTAB 1982), aff'd, 703 F.2d 1372, 217 USPQ 505 (Fed. Cir. 1983).
[49] Id.
[50] Opposer's third notice of reliance.
[51] Id. at Exhibit 448.
[52] Id. at Exhibit 451
[53] Id. at Exhibit 475.

Opposition No. 91170112

4. <u>My SAT Coach</u>.[54]  The game overview describing the software states that "My SAT Coach helps students prepare for the SAT exams by presenting timed drills and other activities in mini-games."

Applicant introduced 19 third-party registrations comprised, in whole, or in part, of the word "Coach" in connection with educational materials and/or services.[55]  Of the nine registrations for educational materials, the exclusive right to use the word "Coach" was disclaimed four times.  Of the ten registrations for educational services, one registration was issued under the provisions of Section 2(f) and the exclusive right to use the word "Coach" was disclaimed four times.

We find that applicant's COACH mark is merely descriptive when used in connection with educational materials for preparing for standardized tests because it immediately conveys to purchasers the purpose of the materials (*i.e.,* preparing students for an examination).  In the context in which the marks are used, purchasers and potential purchasers do not have to use any imagination, thought or perception to reach a conclusion as to the nature of the goods.  The dictionary definition of the word "Coach"

---

[54] *Id.* at Exhibit 483.
[55] Applicant introduced 25 third-party registrations, but six of the registrations are irrelevant because they are not related to applicant's goods in any conceivable way.

Opposition No. 91170112

makes clear that a "coach" is "a private tutor who prepares a student for an examination" or a person who gives instruction and this is precisely the purpose of applicant's educational materials. Moreover, because the word "Coach" is frequently used in the titles of educational books and CD-ROMs, we can infer that consumers will directly associate the use of the word "Coach" as directly informing consumers that the products are for instruction. While the word "Coach" is a personification of the act of instructing or tutoring for an examination, it is not sufficiently metaphorical to be suggestive. Accordingly, we find that applicant's use of the word "Coach" in connection with educational materials for preparing for standardized tests is merely descriptive.

<u>Secondary Meaning</u>

As its sixth affirmative defense in its answer to opposer's amended notice of opposition, applicant pleaded that its COACH marks have acquired distinctiveness or secondary meaning. Based on the record, we find the following facts:

1. Applicant is the largest publisher of educational materials for preparing for standardized tests and COACH is applicant's primary trademark;[56]

---

[56] Fisher Testimony Dep., p. 133.

Opposition No. 91170112

2.   Between 2003 and 2008, applicant's advertising expenditures quadrupled.[57]  Because applicant's advertising expenditures and revenues have been designated confidential, we may refer to them only in general terms.  Applicant's annual advertising expenditures exceed six figures;[58]

3.   Between 2003 and 2008, applicant has increased its distribution of promotional pieces from one million in 2003 to four million in 2008.  Of the four million promotional pieces that applicant distributed in 2008, three million were catalogs and the balance were flyers or brochures;[59]

4.   Between 2003 and 2007, applicant's revenues have been substantial.[60]  They reach seven figures.

5.   While applicant's early use of COACH was as part of a composite mark featuring a state test name (*e.g.,* TEAMS COACH in Texas, IGAP COACH in Illinois, the CLAS COACH in California, etc.), applicant also has been promoting "Coach" as the name of its series of books since as early as 1989. In its 1989 catalog for Texas, applicant began referring to its products as "the TEAMS Coach series."[61]  After Texas changed the name of its test to TAAS from TEAMS in 1990,

---

[57] Fisher Testimony Dep., pp 137-138.
[58] *Id.*
[59] *Id.* at pp. 115-116.
[60] *Id.* at pp. 144-148 and Exhibits 142-144.
[61] *Id.,* Exhibit 18.

Opposition No. 91170112

applicant promoted itself as the "New Coach in Town."[62]  In 1992, applicant used the advertising tagline, "The Team With The Coach Is The Team That Succeeds!"[63]  *See also* applicant's 1995 "the California Coach" catalog promoting "The California CCTP/CLAS Coach Series,"[64] 1996 Michigan MEAP Coach Catalog promoting its "Four New Coach Books" and "EAP 7 HSPT COACH SERIES,"[65] 1997 Illinois IGAP Coach Catalog for the Illinois IGAP COACH SERIES offering "Illinois educators a separate <u>Coach Text</u> for each IGAP test, and all of our Coach Texts are based 100% on Illinois IGAP specifications."[66]  (Emphasis in the original).

Applicant's 1997/98 catalog for its complete line of educational materials included numerous COACH products in multiple states.[67]  The table of contents includes the following new COACH products:

---

[62] *Id.,* Exhibit 19; *see also* Exhibit 37 (the 2000 Virginia SOL Coach Series), Exhibit 38 (the 2000 TAAS Coach Series) and Exhibit 39 (the 2000 Ohio Proficiency Test Coach Series).
[63] *Id.,* Exhibit 21.
[64] *Id.,* Exhibit 32.
[65] *Id.,* Exhibit 34.
[66] *Id.,* Exhibit 35.
[67] *Id.,* Exhibit 36.

Opposition No. 91170112

**NEW THIS YEAR**

*New* Story Starters: The Writing Workshop in a Box . . . . . . . .3
*New* Research & Term Papers, Posters & Pocket Coach . . . .4
*New* Stanford 9 Coach Series . . . . . . . . . . . . . . . . . . . . . . . .27
*New* ITBS/TAP Coach Series . . . . . . . . . . . . . . . . . . . . . . . . .27
4 *New* Coach Texts for Connecticut . . . . . . . . . . . . . . . . . . .28
9 *New* Coach Texts for Illinois . . . . . . . . . . . . . . . . . . . .30–31
5 *New* Coach Texts for Michigan . . . . . . . . . . . . . . . . . .32–33
4 *New* Coach Texts for New Jersey . . . . . . . . . . . . . . . .34–35
5 *New* Coach Texts for New York . . . . . . . . . . . . . . . . .36–37
12 *New* Coach Texts for North Carolina . . . . . . . . . . . . .38–39

6 *New* Coach Texts for Texas . . . . . . . . . . . . . . . . . . . . . .40–41
7 *New* Coach Texts for Virginia . . . . . . . . . . . . . . . . . . . . . .42
3 *New* Coach Texts for Ohio . . . . . . . . . . . . . . . . . . . . . . . .43
*New* Fractions Poster Series . . . . . . . . . . . . . . . . . . . . . . . .45
*New* New Views in Geometry Basal Text . . . . . . . . . . . . . . .61
*New* Our Amazing Ancestors Science Kit . . . . . . . . . . . . . . .62
*New* Slime Science MiniLab . . . . . . . . . . . . . . . . . . . . . . . . .63
*New* Super Circuits TopLab . . . . . . . . . . . . . . . . . . . . . . . . .63
*New* Food & Nutrition Today . . . . . . . . . . . . . . . . . . . . . . . .71
*New* Our U.S. History, Book 2 . . . . . . . . . . . . . . . . . . . . . . .76
*New* U.S. History Timeline Posters . . . . . . . . . . . . . . . . . . .78

TO ORDER CALL **TOLL FREE (800) 221-9372**  FAX (212) 675-6922

**TL03331**

Applicant's 2001 catalog cover referenced "Coach Texts for Test Preparation Basic Skills & Other Supplemental Materials."[68]  By 2002, applicant was regularly touting "Coach Books and Software" on the cover of its catalogs.[69] In 2003, applicant began using COACH as a technical stand alone mark for its educational materials,[70] and has been continuously using COACH as a stand alone mark since then.[71]

Opposer contends applicant's evidence does not prove that applicant's COACH marks have acquired distinctiveness because (1) there is no direct evidence of consumer recognition of applicant's marks, (2) Ms. Fisher's testimony is self-serving, (3) applicant's sales success is not necessarily indicative of acquired distinctiveness, (4) applicant's use has not been substantially exclusive and (5) applicant has not presented any evidence of media

---

[68] *Id.,* Exhibit 40.
[69] *Id.,* Exhibits 42-45.
[70] *Id.,* Exhibit 45 (software) and Exhibit 46 (books).
[71] *Id.,* Exhibits 47-145.

Opposition No. 91170112

recognition or copying.[72]  We disagree with opposer's
conclusion and find that applicant has shown that its COACH
marks have acquired distinctiveness.

To prove that its mark has acquired distinctiveness
under Section 2(f) of the Trademark Act, an applicant may
submit any "appropriate evidence tending to show the mark
distinguishes [applicant's] goods." *Yamaha International v.
Hoshino Gakki,* 840 F.2d 1572, 6 USPQ2d 1001, 1010 (Fed. Cir.
1988), *quoting* Trademark Rule 2.41(a), 37 CFR 2.41(a).  Such
evidence includes the duration, extent and nature of the use
of the mark in commerce, advertising expenditures, letters
or statements from the trade or public, and other
appropriate evidence.  Trademark Rule 2.41(a); *see also In
re Steelbuilding.com,* 415 F.3d 1293, 75 USPQ2d 1420, 1424
(Fed. Cir. 2005) (adding copying, unsolicited media
coverage, and consumer surveys).  "The amount and character
of the evidence, if any, required to establish that a given
word or phrase … 'has become distinctive' of the goods
necessarily depends on the fact of each case particularly on
the nature of the alleged mark." *Roux Laboratories, Inc. v.
Clairol Inc.,* 427 F.2d 823, 166 USPQ 34, 39 (CCPA 1970); *see
also In re Steelbuilding.com,* 75 USPQ2d at 1424 ("no single
factor is determinative … the determination examines all of
the circumstances involving the use of the mark").  With

---

[72] Opposer's Reply Brief, pp. 9-11.

Opposition No. 91170112

respect to the nature of the alleged mark, "the applicant's
burden of showing acquired distinctiveness increases with
the level of descriptiveness; a more descriptive term
requires more evidence of secondary meaning." *In re
Steelbuilding.com,* 75 USPQ2d at 1424.

At the outset, we note that while applicant's COACH
mark is merely descriptive, it is not so highly descriptive
that applicant has the burden to show a concomitantly high
level of acquired distinctiveness. Also, contrary to
opposer's contention, applicant is not required to introduce
a consumer survey or other direct evidence of consumer
recognition. *Yamaha International v. Hoshino Gakki,* 6
USPQ2d at 1010; *Roux Laboratories, Inc. v. Clairol Inc.,* 166
USPQ at 37 n.6. It is well settled that we may determine
the consumer's reaction to the mark based on the inferences
that we can draw from the evidence that is of record. *Id.*

Contrary to our findings of fact listed above, opposer
contends that, with the exception of what it characterizes
as Ms. Fisher's self-serving and uncorroborated testimony,
applicant did not provide any evidence to show that
applicant's use of COACH had acquired distinctiveness.[73] To
the extent that we relied on her testimony, we note that Ms.
Fisher was subjected to rigorous cross-examination, and we

---

[73] Opposer's rebuttal brief, p. 9.

Opposition No. 91170112

find that her testimony was credible.[74] There were no contradictions or inconsistencies and it was sufficiently definite.

With respect to the nature of applicant's use of its COACH marks, we note that while applicant has been using the word "Coach" as a stand alone trademark on its educational materials only since 2003, it has been promoting itself as the "Coach" brand since 1989 through its references to "Coach series," "Coach Books and Software," and "the Coach." Its marketing efforts evidently have been effective because applicant has become the largest publisher of educational materials for preparing for standardized testing.

Based on the record before us, we find that applicant's use of its COACH marks for educational materials for preparing for standardized tests is, and has been, substantially exclusive. The requirement for substantially exclusive use makes allowance for use by others that may be inconsequential or infringing. *L.D. Kichler Co. v. Davoil, Inc.,* 192 F.3d 1349, 52 USPQ2d 1307, 1309 (Fed. Cir. 1999); *Yamaha International v. Hoshino Gakki,* 6 USPQ2d at 1010 (applicant proved that its product configuration had acquired distinctiveness despite evidence that four other companies made similar products prior to registration).

---

[74] As noted above, we specifically did not rely on Ms. Fisher's testimony regarding customer representatives noted by opposer in its brief.

Opposition No. 91170112

We note the 43 book and software titles,[75] the seven websites,[76] and emails from Ken Butkus, applicant's Executive Vice President of Sales and Marketing, warning that competitors may be using titles or marks with the word "Coach."[77] This evidence of purported third-party use is of limited probative value because there is nothing to show that the public is aware of the books and software or if any have been sold. Likewise, there is no evidence of whether the public is aware of the businesses identified by the websites, the number of the customers or the trading area for these businesses. *See Penguin Books Ltd. v. Eberhard*, 48 USPQ2d 1280, 1284 n.5 (TTAB 1998); *In re Broadway Chicken Inc.,* 38 USPQ2d 1559, 1565 n.16 (TTAB 1996). The book titles and websites are evidence for what they show on their face: that a large number of books have "Coach" in their title and that various companies purport to offer self-help counseling, consulting in the field of sports coaching, business consulting services and medical services for low income children using the word "Coach" as part of their name.[78] This evidence does not show that applicant's use of

---

[75] Opposer's third notice of reliance.
[76] Fisher Testimony Dep., pp. 158-167 and Exhibits 154-160.
[77] Fisher Testimony Dep., pp. 183-188 and Exhibits
[78] Two of the websites were for totally irrelevant products: COACHGUARD microphone shield device and the COACH 2 Incentive Spirometer, a device to facilitate post-surgical breathing.

Opposition No. 91170112

its COACH marks for educational materials for preparing for standardized examinations is not substantially exclusive.

Of the book and software titles made of record by opposer few appear to be related to applicant's subject matter. The following titles may fall within the penumbra of educational materials for preparing for standardized tests:

1.  A Writer's Coach:  An Editor's Guide to Words that Work (2006);

2.  The Effective Literacy Coach:  Using Inquiry to Support Teaching and Learning (2007);

3.  Writer's Coach:  The Complete Guide to Writing Strategies That Work (2007);

4.  My SAT Coach (2008); and

5.  My Word Coach (2007).

To the extent that these titles may be related to applicant's educational materials, they all have publication dates subsequent to the filing date of applicant's applications and the dates of first use of applicant's marks.

Finally, the "Coach" marks referenced in the Butkus emails have little probative value.  First, Ms. Fisher, the witness authenticating the emails, had no knowledge regarding the products referenced in the emails and Ms. Fisher testified that to the best of her knowledge the

Opposition No. 91170112

companies purportedly publishing the other "Coach" materials were not competitors of applicant.[79]  Second, there is no evidence that the purported third-party "Coach" products were ever marketed.

In view of the foregoing, we find that applicant's use of its COACH marks has made an impact on the purchasing public in the field of educational materials for preparing for standardized tests as an indication of origin and has acquired distinctiveness.  In view thereof, applicant has established its affirmative defense that its COACH marks have acquired distinctiveness and applicant's registrations will issue with the appropriate notation.

**Decision**:  The opposition is dismissed.

---

[79] Fisher Testimony Dep., pp. 183-186.